LARABEE v. DOLLEY, State Bank Com'r, et al. ASSARIA STATE BANK, OF ASSARIA, KAN., et al. v. SAME. ABILENE NAT. BANK, OF ABILENE, KAN., et al. v. SAME.

(Circuit Court, D. Kansas. First Division. December 23, 1909.)

Nos. 8,810, 8,816, 8,817.

1. EQUITY (§ 239*)—PLEADING—ADMISSIONS BY DEMURRER.
    A demurrer to a bill admits only facts which are well pleaded.
    [Ed. Note.—For other cases, see Equity, Cent. Dig. § 495; Dec. Dig. § 239.*]

2. COURTS (§ 328*)—JURISDICTION OF FEDERAL COURTS—AMOUNT IN CONTROVERSY.
    A suit by a minority stockholder to restrain a misapplication of corporate funds is brought in right of the corporation, and the amount involved, for the purpose of determining the jurisdiction of a federal court,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

is the value of the right of the corporation sought to be protected, and not the value of complainant's interest therein.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 890; Dec. Dig. § 328.*]

3. COURTS (§ 328*)—JURISDICTION OF FEDERAL COURTS—AMOUNT IN CONTROVERSY.

A suit by a stockholder in a banking corporation for an injunction to restrain the acceptance by the bank of the provisions of the bank guaranty law of Kansas (Laws 1909, c. 61), which contemplates a continuing course of business and an initial and annual deposits of money by the bank with the State Treasurer aggregating more than $2,000, which fund may be used by the state in paying losses of other banks, involves a sufficient amount to give a federal court jurisdiction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 890; Dec. Dig. § 328.*]

4. COURTS (§ 282*)—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

A bill by a stockholder in a banking corporation to enjoin the acceptance by the bank of the provisions of the bank guaranty law of Kansas (Laws 1909, c. 61), on the ground that such act is unconstitutional, as impairing the obligation of the contracts of complainant and others as stockholders, by taking their property for the payment of debts which neither they nor the bank have contracted, presents a controversy arising under the Constitution, which is within the jurisdiction of a federal court, regardless of the citizenship of the parties.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 821; Dec. Dig. § 282.*

Jurisdiction in cases involving federal questions, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore-Purchasing Co. v. Boston & M. Consol. Copper & Silver Mining Co., 35 C. C. A. 7.]

5. COURTS (§ 281*)—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

To confer upon a federal court jurisdiction of a suit between citizens of the same state to enjoin the enforcement of a state statute, the bill must present a state of facts which in good faith raises a controversy as to the validity of the act arising under the Constitution or laws of the United States, the decision of which controversy may be determinative of the case.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 820; Dec. Dig. § 281.*]

6. CONSTITUTIONAL LAW (§ 240*)—DENIAL OF EQUAL PROTECTION OF THE LAW—BANK GUARANTY LAW OF KANSAS.

Banking corporations organized under the laws of Kansas cannot maintain suits to enjoin the enforcement of the bank guaranty law of the state (Laws 1909, c. 61), which makes it optional with any bank having a surplus fund equal to 10 per cent. of its capital to accept its provisions, on the ground that the act is unconstitutional, as denying the equal protection of the laws, in that it creates a discrimination in favor of guaranteed banks against those not guaranteed, which will be destructive of the business of the latter, since such banks qualified to accept are not discriminated against, and as to those which are not the discrimination arises from the facts constituting the disqualifying conditions, and not by the law.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 240.*]

7. COURTS (§ 284*)—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

A suit by citizens and taxpayers of Kansas under Laws Kan. 1905, c. 334, to enjoin the alleged illegal expenditure of public money by officers of the state, which will increase the burden of taxation, cannot be maintained

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in a federal court, where the alleged illegality does not arise under any law of the United States.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 820; Dec. Dig. § 284.*

Jurisdiction of federal courts as affected by state laws, see note to Barling v. Bank of British North America, 1 C. C. A. 513.]

8. CONSTITUTIONAL LAW (§ 46*)—RESTRAINING ENFORCEMENT OF STATE STATUTE—RIGHT OF ACTION—NECESSITY OF ACTUAL OR THREATENED INJURY.

A suit by banks in Kansas to enjoin the enforcement of the bank guaranty law of that state (Laws 1909. c. 61), which provides for the creation of a fund to insure the payment of certain classes of deposits in insolvent banks. cannot be maintained on the ground that the act is unconstitutional, as denying the equal protection of the laws to complainants as depositors in other banks whose deposits are not within the guaranty, where it is not shown that any such case of insolvency of a guaranteed bank has actually arisen by which the rights of complainants are threatened.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 43–45; Dec. Dig. § 46.*]

9. COURTS (§ 294*) — JURISDICTION OF FEDERAL COURTS — SUITS BY NATIONAL BANKS—FEDERAL QUESTION—"CITIZENS."

While, under Act March 3, 1887, c. 373. § 4, 24 Stat. 554, as amended by Act Aug. 13, 1888, c. 866, § 4, 25 Stat. 436 (U. S. Comp. St. 1901, p. 514), national banks are deemed "citizens" of the states where located for the purposes of federal jurisdiction, yet, when a right is asserted by a national bank under authority of the law of its creation, the determination of such right involves a federal question, of which a federal court has jurisdiction, without regard to citizenship, if the requisite amount is involved.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 836; Dec. Dig. § 294;* Banks and Banking, Cent. Dig. § 1056.

For other definitions, see Words and Phrases, vol. 2, pp. 1164–1174; vol. 8, p. 7602, 7603.]

10. COURTS (§ 294*)—BANKS AND BANKING (§ 274*)—NATIONAL BANKS—RIGHT TO SUE IN BEHALF OF STOCKHOLDERS.

A national bank located in Kansas, for the protection of its stockholders as taxpayers of the state, may maintain a suit under Laws Kan. 1905, c. 334, to enjoin the illegal expenditure of public money, and may exercise such right of suit in a federal court, where such court has jurisdiction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 836; Dec. Dig. § 294;* Banks and Banking, Dec. Dig. § 274.*]

11. COURTS (§ 328*)—JURISDICTION OF FEDERAL COURTS—AMOUNT IN CONTROVERSY.

Under Laws Kan. 1905, c. 334, which permits any number of persons whose burdens as taxpayers may be increased thereby to join in a suit to enjoin the unauthorized expenditure of public money by state officers, the value of the right sought to be protected from invasion, and not the loss which may result to each separate complainant. measures the amount in controversy for the purposes of federal jurisdiction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 891; Dec. Dig. § 328.*

Jurisdiction of Circuit Courts as determined by the amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75; Tennant-Stribling Shoe Co. v. Roper, 36 C. C. A. 459.]

12. COURTS (§ 264*)—JURISDICTION OF FEDERAL COURTS—QUESTIONS INCIDENTALLY ARISING.

Where a federal court has jurisdiction of a suit on other grounds, and to grant relief under a federal statute. it may also determine a right as-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

serted under a state statute, alleged as an additional ground for the same relief.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 801; Dec. Dig. § 264.*]

13. CONSTITUTIONAL LAW (§ 47*)—STATUTES—RULES OF CONSTRUCTION.
The validity of a statute is to be determined from its terms and its natural and necessary operation and effect.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 43–45; Dec. Dig. § 47.*]

14. CONSTITUTIONAL LAW (§§ 125, 126*)—POWER OF STATES—IMPAIRMENT OF OBLIGATION OF CONTRACTS—AMENDMENT OF CHARTER OF CORPORATIONS—"CONTRACT."
The charter of a private corporation having capital stock, organized under a general law of the state, constitutes a "contract" between the state and the corporation, between the state and the shareholders in the corporation, and between the corporation and its shareholders, which cannot be violated by the state, and while, under a power reserved in the Constitution, it may repeal or amend such statutes, the amendments must be reasonable and consistent with the scope and object of the statute, and cannot deprive the corporation or its stockholders of property rights acquired thereunder.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 325, 362–413; Dec. Dig. §§ 125, 126.*

For other definitions, see Words and Phrases, vol. 2, pp. 1513–1530; vol. 8, pp. 7615–7616.]

15. CONSTITUTIONAL LAW (§ 283*)—DUE PROCESS OF LAW—TAKING PROPERTY FOR PRIVATE USE.
A state cannot, by the exercise of the power of taxation or any other governmental power, take private property for a purely private use.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 891, 892, 904–906; Dec. Dig. § 283.*]

16. CONSTITUTIONAL LAW (§§ 154, 296*)—STATE REGULATION—BANK GUARANTY LAW OF KANSAS—CONSTITUTIONALITY.
Prior to the passage of the bank guaranty law of Kansas (Laws 1909, c. 61), a banking corporation of that state had no authority under the statutes to use its property for the payment of the private debt of a third party for which it was in no way liable. By such act any such banking corporation having the required qualifications was authorized to accept its provisions by a vote of its directors, authorized by its stockholders, and on such acceptance was required to make a deposit of bonds or cash with the State Treasurer and to pay assessments annually to create a state fund to be used to secure the payment in full of certain classes of depositors in any insolvent bank which had accepted its provisions. Held that, as against a nonconsenting stockholder of a bank previously organized which accepted its provisions, such act was unconstitutional and void, as impairing the obligation of his contract as a stockholder, and also as taking his property without due process of law, since the state, having no power to take the property of the corporation to pay the private debt of another, such as that of another bank to a depositor, could not authorize the corporation to so use it as against a dissenting stockholder.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 461–473; Dec. Dig. §§ 154, 296.*]

17. BANKS AND BANKING (§ 233*)—NATIONAL BANKS—STATE LAWS AFFECTING.
National banks are instrumentalities of the federal government, and any action of a state which impairs their efficiency as such governmental

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

agencies, or interferes with their legitimate business as banks, is unconstitutional and void.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 879–887; Dec. Dig. § 233.*]

**18.** CONSTITUTIONAL LAW (§ 240*)—BANK GUARANTY LAW OF KANSAS—CONSTITUTIONALITY.

The bank guaranty law of Kansas (Laws 1909, c. 61), providing that certain banking corporations incorporated by the state, which accept its provisions, shall create and maintain a fund in possession of the State Treasurer, to be administered by the state and employed for the purpose of securing the general depositors of any bank contributing thereto in case of its insolvency, is unconstitutional and void, as denying the equal protection of the laws to national banks within the state, which are debarred by the laws of the United States, under which they are organized, from accepting the provisions of said act, by creating competing state banks authorized to advertise the fact that their deposits are guaranteed, the effect of which, as must be presumed to have been the intention, is to draw depositors from the national banks and destroy their business.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 240.*]

In Equity. Suits by Frank S. Larabee, by the Assaria State Bank, of Assaria, Kan., and others, and by the Abilene National Bank, of Abilene, Kan., and others, respectively, against J. N. Dolley, as Bank Commissioner of the State of Kansas, and others. On demurrers to bills and motions for preliminary injunctions. Demurrer sustained in case of Assaria State Bank. Demurrers overruled and injunctions granted in both other cases.

Chester I. Long, J. W. Gleed, John L. Hunt, B. P. Waggener, and John L. Webster, for complainants.

F. S. Jackson, A. C. Mitchell, and G. H. Buckman, for defendants.

POLLOCK, District Judge. Separate bills of complaint have been presented in the above entitled and numbered cases, calling in question the constitutional validity of an act of the Legislature of this state (chapter 61 Laws of 1909), commonly known as the "Bank Guaranty Law" of the state. By that act it is provided as follows:

"An act providing for the security of depositors in the incorporated banks of Kansas, creating the bank depositors' guaranty fund of the state of Kansas, and providing regulations therefor, and penalties for the violation thereof.

"Be it enacted by the Legislature of the state of Kansas:

"Section 1. Any incorporated state bank doing business in this state under the general banking laws of Kansas, having a paid-up and unimpaired surplus fund equal to ten per cent of its capital, and any bank which may after the passage of this act be authorized to do business in this state, and which shall have been actively engaged in the business of banking for at least one year, and having such surplus fund, is hereby authorized and empowered to participate in the assessments and benefits and to be governed by the regulations of the bank depositors' guaranty fund of the state of Kansas hereinafter provided for; provided, that the limitation of one year shall not prevent such participation by a new bank at any time in any city or town in which all banks shall have neglected or failed to become guaranteed banks under the provisions of this act for a period of six months after the taking effect of this act. Before any bank shall become a guaranteed bank within the meaning of this act a resolution of its board of directors, authorized by its stockholders, duly certified by its president and secretary, asking therefor, in form to be pro-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

175 F.—24

vided by the bank commissioners, shall be filed with said bank commissioner, who shall, upon the filing of such resolution, make a rigid examination of the affairs of such bank, and if it is found to be solvent, to be properly managed and conducting its business in strict accordance with the banking law, he shall, after the bank shall have deposited with the state treasurer bonds or money as hereinafter provided, issue to such bank a certificate stating in substance that said bank has complied with the provisions of this act, and that its depositors are guaranteed by the bank depositors' guaranty fund of the state of Kansas, as herein provided.

"Sec. 2. Before receiving such certificate from the bank commissioner, each bank entitled to the same according to section 1 of this act shall, as an evidence of good faith, deposit, and shall at all times maintain with the state treasurer (subject to the order of the bank commissioner when countersigned by the auditor of state) United States bonds, Kansas state bonds, or the bonds of any county, township, school district, board of education or city within the state of Kansas, to the amount of five hundred dollars for every one hundred thousand dollars or fraction thereof of its average deposits eligible to guaranty (less its capital and surplus) as shown by its last four published statements; provided, that each bank shall so deposit not less than five hundred dollars, and the state treasurer shall issue his receipt therefor in triplicate, one to the bank, one to the auditor of state, and one to the bank commissioner. Such bonds only shall be accepted as the school fund commissioners of the state of Kansas are permitted to buy, and shall bear the certificate of the attorney general of the state of Kansas stating that in his opinion said bonds have been legally issued. Said bonds, or cash in lieu thereof, shall not be charged out of the assets of the bank, except as hereinafter provided, but shall be carried in its assets under a heading 'Guaranty Fund with State Treasurer' until such time as said bank shall default in payment of assessments hereinafter provided for. In lieu of bonds the bank, at its option, may deposit money, which deposits shall be exchangeable for acceptable bonds when the bank elects to make the substitution. In addition to above each bank shall pay in cash an amount equal to one-twentieth of one per cent of its average deposits eligible to guaranty, less its capital and surplus, and the same shall be credited to the bank depositors' guaranty fund with the state treasurer subject to the order of the bank commissioner, and the state treasurer shall issue his receipt therefor in triplicate, one to the bank, one to the auditor of state, and one to the bank commissioner; provided, that the minimum assessment to be required from any bank shall be twenty dollars; provided further, that any bank seeking to participate in the assessments and benefits of this act after the first annual assessment for the year 1910 shall have been made, shall be assessed an amount approximately equal to its proportionate share of the money then in the bank depositors' guaranty fund after all losses shall have been deducted, the amount of such assessment to be determined by the bank commissioner. The last above mentioned assessment, however, shall not be required of new banks formed by the reorganization or consolidation of banks which have previously complied with the terms of this act. Upon the deposit and acceptance of such bonds (or money) and the payment of said assessment, then the payment of such deposits of said bank as are specified in this act shall be guaranteed as herein provided, and the bank entitled to its certificate.

"Sec. 3. The bank commissioner shall, during the month of January of each year, make assessments of one-twentieth of one per cent of the average guaranteed deposits, less capital and surplus, of each bank (the minimum assessment in any case to be twenty dollars) until the cash fund accumulated and placed to the credit of the bank depositors' guaranty fund shall be approximately five hundred thousand dollars over and above the cash deposited in lieu of bonds, when he shall discontinue such assessments. Should such fund become depleted the bank commissioner shall make such additional assessments from time to time as may become necessary to maintain the same; provided, that not more than five such assessments of one-twentieth of one per cent each shall be made in any one calendar year. The treasurer of the state of Kansas shall hold this fund in the state depository banks as provided by law governing other state funds, subject to the order of the bank commission-

er, to be countersigned by the auditor of state, for the payment of depositors of failed guaranteed banks, as hereinafter provided. The state treasurer shall credit this fund quarterly with its proportionate share of interest received from state funds, computed at the minimum rate of interest provided by law, upon the average daily balance of said fund.

"Sec. 4. When any bank shall be found to be insolvent by the bank commissioner he shall take charge of such bank, as provided by law, and proceed to wind up its affairs; and he shall, at the earliest moment, issue to each depositor a certificate, upon proof of claim, bearing six per cent interest per annum, upon which dividends shall be entered when paid, except where a contract rate exists on the deposit, in which case the certificate shall bear interest at the contract rate; notice of the amount of each dividend to be paid creditors and the date when such payment is to be made shall be published in two consecutive issues of a paper of general circulation in the county or city in which such failed bank is located, and a corresponding notice posted on the door of the receiver's office, and interest shall cease on each dividend on the day named in such notice. The bank commissioner shall likewise publish a notice of the date upon which he will make payments of any balance due on such proof of claim, and interest shall cease on the day so advertised, and said proof of claim shall so state. After the officer in charge of the bank shall have realized upon the assets of such bank and exhausted the double liability of its stockholders, and shall have paid all funds so collected in dividends to the depositors, he shall certify all balances due on guaranteed deposits (if any exist) to the bank commissioner, who shall then, upon his approval of such certification, draw checks upon the state treasurer, to be countersigned by the auditor of state, payable out of the bank depositors' guaranty fund, in favor of each depositor for the balance due on such proof of claim as hereinafter provided. If at any time the available funds in the bank depositors' guaranty fund shall not be sufficient to pay all guaranteed deposits of any failed bank, the five assessments herein provided for having been made, the bank commissioner shall pay depositors pro rata and the remainder shall be paid when the next assessment is available; provided, however, that whenever the bank commissioner shall have paid any dividend to the depositors of any failed bank out of the bank depositors' guaranty fund, then all claims and rights of action of such depositors so paid shall revert to the bank commissioner for the benefit of said bank depositors' guaranty fund, until said fund shall have been fully reimbursed for payments made on account of such failed bank, with interest thereon at three per cent per annum.

"Sec. 5. A penalty of fifty per cent of the amount of said assessment shall be added to the assessment of any bank not remitting as aforesaid within thirty days after receipt of notice of such assessment from the bank commissioner, and if any bank which shall have been assessed and notified as aforesaid shall fail to remit the amount of said assessment as herein provided, a sufficient amount of its bonds (together with the unexpired coupons) shall be immediately sold by the bank commissioner at public sale and the proceeds used to pay said assessment. Any balance remaining from the proceeds of such sale after the payment of such assessment shall remain to the credit of the bank in the depositors' guaranty fund. The said balance, together with the remainder of the bonds (or cash in lieu thereof) shall be forfeited to the bank depositors' guaranty fund if the bank does not, within sixty days from default in payment of such assessment, remit the full amount of such assessments and penalty to date, and restore the amount of its bonds, or money pledged, as evidence of good faith. Upon the bank's failure to remit its assessments according to the terms of this act the bank commissioner shall immediately examine such bank, and if it is found in his judgment to be insolvent he shall take charge of and liquidate said bank according to law. If said bank be found solvent, the bank commissioner shall cancel its certificate as a guaranteed bank and cause to be displayed in its banking rooms, in a conspicuous place, continuously for six months, a card not smaller than twenty inches by thirty inches and in large, plain type, reading as follows: 'This bank has withdrawn from the bank depositors' guaranty fund and the guaranty of its deposits will cease on and after ———.' The date on this card shall be a date six months after the first posting of such card. Any bank

electing to withdraw from the bank depositors' guaranty fund may do so by giving notice to the bank commissioner and displaying a card as aforesaid, and at the expiration of the six months as aforesaid may receive its bonds (provided always that said bank shall have paid assessments in full to date) when the affairs of all failed banks in liquidation at the expiration of said six months shall have been closed up and the said bank shall have paid its assessments on account of same.

"Sec. 6. Deposits which do not bear interest and the following deposits only shall be guaranteed by this act: Time certificates not payable in less than six months from date and not extending for more than one year, bearing interest at not to exceed three per cent per annum and on which interest shall cease at maturity; savings accounts not exceeding in amount one hundred dollars to any one person and not subject to check, upon which the bank has reserved in writing the right to require sixty days' notice of withdrawal, and bearing interest at not to exceed three per cent per annum and on which interest shall cease at maturity; savings accounts not exceeding in amount one hundred dollars to any one person and not subject to check, upon, which the bank has reserved in writing the right to require sixty days' notice of withdrawal, and bearing interest at not to exceed three per cent per annum. Deposits which are primarily rediscounts or money borrowed by the bank, and all deposits otherwise secured shall not be guaranteed by this act. Each guaranteed bank shall certify under oath to the bank commissioner at the date of each called statement the amount of money it has on deposit not eligible to guaranty under the provisions of this act, and in assessing such bank this amount shall be deducted from its total deposit. The guaranty as provided for in this act shall not apply to a bank's obligation as indorser upon bills rediscounted, nor to bills payable, nor to moneys borrowed temporarily from its correspondents or others.

"Sec. 7. Each bank guaranteed by this act shall keep a correct record of the rate of interest paid or agreed to be paid to each depositor, and shall make a statement thereof under oath to the bank commissioner quarterly. If a bank displays a card or in any manner advertises that its depositors are guaranteed, such bank, if it pays or agrees to pay, either directly or indirectly, interest at any rate greater than three per cent per annum upon deposits of any kind, class, or character, shall state upon or in the same card or advertisement that no deposits are guaranteed which bear a greater rate of interest per annum than three per cent; and this portion of the advertisement must be in type of the same size as that used in stating that the deposits in the bank are guaranteed. No bank which pays interest at a rate greater than three per cent per annum on any form of deposit, or pays any interest on savings deposits withdrawn before July 1 or January 1 next following the date of the deposit, or on any time certificate cashed before maturity, shall be permitted to participate in the benefits of this act; provided, however, that any existing contracts for higher rates of interest entered into before the passage of this act may be carried out unimpaired, and such existing contracts shall not disqualify a bank to participate in the benefits of this act. Any managing officer of any bank guaranteed under this act, or any person acting in its behalf or for its benefit, who shall hereafter pay or promise to pay any depositor, either directly or indirectly, any rate of interest in excess or in addition to the minimum rate of interest permitted by this act, or who shall, with intent to evade any of the provisions of this act, pledge the time certificate or other obligation of such bank as security for the personal obligation of himself or any other person, shall be guilty of a misdemeanor punishable by a fine of not less than five hundred dollars nor more than five thousand dollars, or by imprisonment not exceeding one year, or by both such fine and imprisonment. The display of any card or other advertisement tending to convey the impression that the deposits of the bank are guaranteed by the state of Kansas, either directly or indirectly, shall be a misdemeanor and shall subject the offender to a fine of five hundred dollars, and any bank displaying a card or advertisement to the effect that its deposits are guaranteed by the bank depositors' guaranty fund of the state of Kansas when not authorized so to do under the provisions of this act shall be guilty of a misdemeanor, and upon conviction

thereof shall be subject to a fine of not less than five hundred dollars nor more than one thousand dollars.

"Sec. 8. Any trust company heretofore organized under the laws of this state, and now in operation, may reorganize as a state bank under the laws of this state by filing with the secretary of state an amended charter signifying such purpose, to be approved by the Charter Board; and any private bank or national bank having the required capital and being otherwise qualified, may reorganize as a state bank; or any newly organized bank taking over the business of another bank, otherwise qualified, may immediately become a guaranteed bank by depositing bonds or money and paying its assessments and otherwise complying with the provisions of this act.

"Sec. 9. A solvent bank, upon retiring from business and liquidating its affairs, shall be entitled to receive back from the state treasurer, after all the depositors in such bank have been paid in full, its bonds or money pledged, but not any part of any unused assessment that may be in the bank depositors' guaranty fund; provided, however, that should such bank be turning over its business to another bank it shall not receive back its bonds, or money deposited in lieu thereof, until the bank receiving its business shall have deposited with the state treasurer bonds, or money in lieu thereof, according to the requirements of this act.

"Sec. 10. Banks may be permitted, in the discretion of the bank commissioner, to exchange their bonds for others acceptable under this act, or be allowed to deposit in lieu thereof an equal amount in cash, which may in turn be withdrawn upon the substitution of bonds acceptable under this act.

"Sec. 11. If at any regular or special examination of a guaranteed bank it shall be found to be violating any of the provisions of this act, the bank commissioner shall notify the bank, and the bank may be given thirty days in which to comply with the provisions of this act; and if at the expiration of this time such provisions have not been complied with the bank commissioner shall cancel its certificate of membership in the bank depositors' guaranty fund as herein provided and forfeit its bonds deposited with the state treasurer for the benefit of the bank depositors' fund.

"Sec. 12. All bonds, and moneys deposited in lieu of bonds, placed in the state treasury under this act shall be kept in said treasury separate from all other bonds and moneys and to the credit of the bond account of the bank depositors' guaranty fund, and shall be used for no other purpose. The state treasurer shall cause the coupons upon the said bonds to be cut thirty days before maturity and sent or delivered to the bank which deposited them; provided always, that said bank shall have paid all assessments in full to date.

"Sec. 13. After the passage of this act any national bank doing business in the state of Kansas, under the laws of the United States, after an examination at its expense by the state bank commissioner, and upon his approval as to its financial condition, may at its option participate in the assessments and benefits of the bank depositors' guaranty fund of the state of Kansas upon the same terms and conditions as apply to state banks; provided, that such national bank shall forward to the bank commissioner of the state of Kansas detailed reports, in form to be provided by him, of its condition on the dates of the usual called statements of state banks (such report not to be published except at the option of the bank), and shall submit to one examination each year by his department (or oftener in his discretion) as provided by the banking laws of the state of Kansas, and pay the usual fees therefor. Should a national bank disregard or refuse to comply with any recommendation made by the bank commissioner, in conformity with the provisions of this act, it shall immediately be subject to the provisions and penalties of this act and its certificate of membership in the bank depositors' guaranty fund shall be canceled.

"Sec. 14. It shall be unlawful for any bank guaranteed under the provisions of this act to receive deposits continuously for six months in excess of ten times its paid-up capital and surplus, and the violation of this section by any bank shall cancel its rights to participate in the benefits of the bank depositors' guaranty fund, and work a forfeiture of its bonds deposited with the state treasurer for the benefit of such fund.

"Sec. 15. For the purpose of carrying into effect the provisions of this act

the bank commissioner shall provide forms and make requisition on the state printer for the necessary blanks, and all reports received by the bank commissioner shall be preserved by him in his office. The state treasurer is authorized to provide forms and make requisition on the state printer for the necessary blanks and record-books for his office.

"Sec. 16. All acts and parts of acts in conflict with this act are hereby repealed in so far as they so conflict, but no provision of any banking law or other statute of this state shall be construed to be amended, modified or repealed, except in so far as necessary to permit the unrestricted operation of this act as applied to banks participating in the privileges of this act.

"Sec. 17. This act shall take effect and be in force from and after June 30, 1909, and its publication in the official state paper."

To the form and manner of the matters averred in the several bills of complaint so presented no exceptions have been taken by defendants. On the contrary, general demurrers have been interposed thereto, challenging the sufficiency of the averments (1) to confer jurisdiction on this court; (2) to entitle complainants to the relief prayed.

The consideration of the questions presented renders necessary a statement of the facts averred in the several bills of complaint touching the relation of complainants to and their interest in the subject-matter of the controversy presented; for as complainants and defendants in the several cases are each and all citizens of this state, to confer jurisdiction on this court, the cases must (1) arise under the Constitution and laws of the national government, and (2) must involve property rights of sufficient amount to confer jurisdiction on this court; else the demurrers must be sustained.

In considering the facts averred in the several bills of complaint for the purpose of testing their legal sufficiency as against the demurrers, it is clear only such matters as may be regarded as well pleaded may be accepted as admitted. Dillon v. Barnard, 21 Wall. 430, 22 L. Ed. 673; United States v. Ames, 99 U. S. 35, 25 L. Ed. 295; Interstate Land Co. v. Maxwell Land Grant Co., 139 U. S. 569, 11 Sup. Ct. 656, 35 L. Ed. 278; Chicot v. Sherwood, 148 U. S. 536, 13 Sup. Ct. 695, 37 L. Ed. 546; Equitable Life Assurance Society v. Brown, 213 U. S. 25, 29 Sup. Ct. 404, 53 L. Ed. 682. In conformity with this rule the relation of complainants to and their interest in the subject-matter of the controversy presented by the several bills of complaint may be briefly summarized as follows:

Complainant in case No. 8,810, Frank S. Larabee, a minority stockholder in the State Exchange Bank of the city of Hutchinson, this state (hereinafter called the "Bank"), and the owner of 20 shares therein, of the par value of $100 each, and of the actual value of $3,500, presents his bill against the Bank Commissioner and Treasurer of the State, whose duties are prescribed in and defined by the terms of the act; also against the Bank, in which he is a shareholder. It is averred that prior to the institution of this suit, over the protest and objection of complainant, a majority of the shareholders in the Bank had voted authorizing its board of directors to accept the provisions of the act, and in pursuance of such authority the board of directors had, by resolution duly certified as provided in section 1 of the act, declared the intention to accept the terms and conditions of the act; that the capital stock of the Bank is $200,000; that in compliance with

the provisions of the act the Bank had deposited with defendant the Treasurer of the State the sum of $1,000 in lieu of that amount of bonds, and had also deposited with the Treasurer the further sum of $84.56, the same being one-twentieth of 1 per cent. of its average deposits eligible to guaranty, less its capital and surplus. It is further averred that the amount which the Bank, by accepting the provisions of the act, will become liable to pay thereunder, is more than $2,000; that, unless restrained, defendants, as Treasurer and Bank Commissioner of the State, will devote the funds of the Bank pledged and required to be pledged to carrying out the provisions of the act, and will enforce all and singular the provisions and obligations of the act against the Bank; that defendant Dolley, as Bank Commissioner, will accept the Bank as eligible to certification under the law, and that the Bank will accept its provisions and obligations as binding on it; that the amount which the Bank has paid and will be required to pay under the provisions of the act is more than $2,000; that the act is beyond the constitutional power of the Legislature of the state, because in violation of the provisions of the national Constitution, as more particularly hereinafter stated. Wherefore a decree is sought declaring the act unconstitutional and void, and enjoining the Bank Commissioner from issuing his certificate to the Bank that it is guaranteed in pursuance of the law, and the Bank from receiving and accepting the same, and the obligations imposed by the law; restraining defendant Treasurer of the State from paying out said moneys deposited with him except by refunding the same to the Bank, and enjoining defendants from in any way carrying into force and effect the provisions of the law.

In case No. 8,816, in which the Assaria State Bank and 46 other state banks are complainants, and the Treasurer and Bank Commissioner of the State are defendants, it is averred that at and before the passage of the act in question complainants were organized, qualified, and doing a banking business under and in pursuance of the laws of the state, in the several portions of the state where located; that in pursuance of the laws under which they were created and doing business prior to the passage and taking effect of the act in question their shareholders were liable, in addition to the money represented by their shares, to an amount equal to the par value thereof to the creditors of the bank; that a part only of complainants are qualified to accept the terms of the act; that complainants are taxpayers of the state, and a large amount of the funds so collected from complainants by taxation, forming a part of the general revenue fund of the state, is being employed by defendants in carrying into effect the act in question, but that no complainant has been required to, or will, pay into such fund to be so used the sum of $2,000; that it is the object, purpose, and intent of defendants, as officers of the state, to require all qualified banks to accept the provisions and obligations of the act; that many banks of the state are accepting its provisions; that more than 700 in number are qualified to accept under the provisions of the act; that those of complainants who are not qualified, and all complainants that are qualified, but refuse to accept the provisions

of the act, will be by the operation of the law, and the business advantages possessed by banks under the law, driven out of business and compelled to suspend operations; that as to each of the complainants the right to continue in business, which will be thus destroyed, is of a value in excess of $2,000; that complainant banks are depositors in other banks of the state in large amounts, that have accepted the provisions of the act, or, being qualified, threaten to accept such provisions, and that the operation of the law discriminates against complainants; that the act in question is violative of the Constitution and laws of the United States, and the provisions of the Constitution of the state as well, in respects hereinafter stated. Wherefore a decree is prayed declaring the act in question invalid and void and restraining defendants from enforcing its provisions.

In case No. 8,817, wherein the Abilene National Bank, of Abilene, Kan., and 149 other national banks are complainants, and the Treasurer and Bank Commissioner of the State are defendants, it is averred that at and before the passage and taking effect of the act in question, complainants, each and all, were organized under authority of national law and were engaged in doing business as national banks and as governmental agencies at different points within the state; while invited by section 13 of the act to accept its provisions, yet by the laws of their creation they are perpetually disqualified from so doing; that by their manner of doing business they are depositors in and creditors of many state banks which are qualified, and have or are threatening, to accept the provisions of the act in question; that their shareholders are taxpayers of the state, compelled by its laws to contribute to the general revenue fund of the state; that a portion of the funds which the shareholders of complainants have been compelled by taxation to pay is being employed, and will be employed, by defendants in carrying into effect the provisions of the act, but that no one of the complainants has or will be compelled by way of taxation to contribute the sum of $2,000, which will be employed in this manner by defendants; that complainants were organized by their shareholders and entered upon the conduct of the business and began performing the functions of national banks within the state under the assurance from the national government that such business would be protected against invasion by laws of the state; that there are more than 700 state banks organized and doing a banking business in the state, which are qualified to accept the provisions of the act; that it is the object, intent, and purpose of defendant officials of the state to require the qualified banks organized under the laws of the state to accept the provisions of the act in question; that many of them have and others are threatening to so do; that by the natural and necessary operation of said act complainants will be compelled to either surrender their charters and organize as banking corporations under the laws of the state, and accept the provisions of the act, or be driven out of business. In this regard it is especially averred in paragraph 9 of the bill as follows:

"That the depositors in banks which have not accepted the provisions of said law are not guaranteed, while the depositors in banks which have accepted the provisions of said law suppose themselves to be guaranteed, and are led to be-

Here by the state of Kansas, and by the defendant J. N. Dolley, as Bank Com missioner of the State of Kansas, and by said guaranteed banks, that they are guaranteed, and the state of Kansas advertises that the depositors in banks which have accepted the provisions in said law are guaranteed; and that, in case the law remains in force and effect, banks which may not accept the pro visions of said law will be forced to cease doing business for the reason that all, or a large part, of their deposits will be withdrawn, and will be forced to wind up their business, or to reincorporate in such a way as to entitle them to the benefits of said law, if any such benefits there are.  That the right of said complainant banks and the right of each of them to do business and ex ercise the franchise of national banks is of the value of more than $2,000, ex clusive of interest and costs, to each of said banks, and in case said law is en forced your orators and each of them will be compelled either to go out of the banking business or to surrender their charter as national banks and to re incorporate as state banks."

## It is further averred in paragraph 14 of the bill as follows:

"That said bank guaranty law, in its force and effect, and in its practical application, is intended to be and is unjustly and unlawfully discriminatory in favor of and in behalf of the banks which shall accept of its provisions, and against all banks, state or national, which shall not accept of its provisions. That said law is in its very essence fraudulent, and promotive of fraud and deception.  In its practical workings it gives depositors a false assurance, and persuades and tends to persuade them that they are guaranteed and secured, when they are in fact not guaranteed or secured.  It requires of the Bank Commissioner a certificate which is false and misleading, and which in its practical working, and especially because it emanates from the sovereign state, tends to mislead and deceive the public as to the degree of security of fered.  It encourages, makes easy, and directly causes false representation by so-called guaranteed banks, which banks are securing deposits by false signs and advertisements tending to persuade the public that their depositors are guaranteed by the state of Kansas and by an adequate special fund provided by the state of Kansas.  Said act thus gives banks which accept its provisions the right and power, under the guise and sanction of law, to obtain deposits by false and fraudulent representation; and by virtue of said law said banks are, as a matter of fact, so obtaining deposits, to the great injury of banks honestly and fairly conducted.  That said law in its practical operation and effect (under and by virtue of the certificate which under the said act is to be issued by the Bank Commissioner to the banks which accept of the said guaranty provision) is intended to and will enable, authorize, and empower the banks which accept the guaranty provisions to hold out to depositors and to the public that the depositors therein are guaranteed, and that depositors in other banks are not so guaranteed, and all other banks are prohibited by the said law from giving out or advertising that their deposits are guaranteed, whereby and by reason whereof banks of small capitalization and otherwise insecure may induce and persuade citizens of the state of Kansas, and others, to deposit their money in said guaranteed banks in preference to making such deposits in banks not so guaranteed, and therein and thereby to wrongfully discriminate against and to deplete and diminish the deposits in banks not under the guaranteed system and to the advantage of the banks which are in the guaranteed system, and as against all banks which cannot, under the terms of the act, go into the said guaranty system, and including national banks, and as against trust companies which cannot go into the system."

## It is further specially averred in paragraph 17 as follows:

"That each and all of the stockholders of complainant banks subscribed to such stock relying upon the guaranty of the federal Constitution, and that the said banks in which they became stockholders would be permitted to carry on and prosecute their business in the state of Kansas without any interference by partial and discriminating legislation, or legislation which would give to state banks an unequal and undue advantage over national banks.  That said chapter 61, Laws of 1909, in its effect and operation, gives to state banks an

unequal and undue advantage over national banks, and impedes and frustrates them in the prosecution of their business, and impairs their efficiency, and deprives them of their trade, and induces a withdrawal of their deposits, and thereby destroys the value of the stock so held by their shareholders."

The act is further averred to be a violation of the provisions of the national Constitution as hereinafter more particularly stated. Wherefore it is prayed that a decree be ·entered declaring the act unconstitutional and void, and restraining defendants from enforcing its provisions as against the rights of complainants.

From this statement of the contents of the several bills of complaint, do complainants, or any of them, show themselves entitled to invoke the jurisdiction of this court for the purpose of testing the validity of the act in question? That is, do they present a controversy under the Constitution or laws of the general government, the determination of which controversy may be decisive of the case, in which there is involved the amount required to give jurisdiction to this court?

In so far as complainant in case No. 8,810 is concerned, it is quite clear, as he is a minority stockholder in a corporation, and brings the suit to prevent the company in which he is interested from the continued misapplication of its corporate funds, the amount involved in the controversy is the value of the right of the bank sought to be protected by the suit, and not the burden which will be by the law laid on his shares. In Davenport v. Dows, 18 Wall. 626, 21 L. Ed. 938, Mr. Justice Davis, delivering the opinion of the court, said:

"That a stockholder may bring a suit when a corporation refuses is settled in Dodge v. Woolsey, 18 How. 340 [15 L. Ed. 401]; but such a suit can only be maintained on the ground that the rights of the corporation are involved. These rights the individual shareholder is allowed to assert in behalf of himself and associates, because the directors of the corporation decline to take the proper steps to assert them. Manifestly the proceedings for this purpose would be so conducted that any decree which shall be made on the merits shall conclude the corporation. This can only be done by making the corporation a party defendant. The relief asked is on behalf of the corporation, not the individual shareholder, and if it be granted the complainant derives only an incidental benefit from it."

In Hill v. Glasgow R. Co. (C. C.) 41 Fed. 610, which was an action by a minority stockholder to restrain a claimed misapplication of the funds of the company, it is said:

"The position assumed by the demurrants is that the complainant's interest in the litigation or controversy must amount to the value of $2,000, exclusive of costs and interest, in order to confer jurisdiction upon the court, and that, as it distinctly appears from the bill that such interest of the complainant does not exceed half that amount, the suit cannot be maintained. This position is not well taken. It overlooks and mistakes the true theory and principle of the bill, which is not the assertion of the complainant's private rights, but rather those of the company in which he had an interest. When suit is necessary to enforce corporate rights to avert wrongs threatening the corporate interests, the general rule is that the suit must be brought by the corporate management in the name of the corporation. Individual shareholders ordinarily are not the proper parties to sue or defend on behalf of corporate interests. It is, however, well settled that if the corporate management refuses or fails to enforce corporate rights, and an irreparable injury to the corporate interests is threatened, a shareholder, in a case where the corporation itself would be entitled to an injunction, may bring suit, on behalf of himself and others interested who may join, to enjoin the threatened injury.

In Texas & P. Ry. Co. v. Kuteman, 54 Fed. 547, 4 C. C. A. 503, it is said:

"In a suit for an injunction the amount in dispute is the value of the object to be gained by the bill. Post. Fed. Pr. § 16. An injunction may be of much greater value to the complainant than the amount in controversy in cases of dispute which have already arisen. Symonds v. Greene [C. C.] 28 Fed. 834; Whitman v. Hubbell [C. C.] 30 Fed. 81. The maintenance of its rates is the real subject of dispute, and the object of the bill and the value of this object must be considered. Railroad Co. v. Ward, 2 Black, 485 [17 L. Ed. 311]. This value not being liquidated or fixed by law, the alleged value, especially on demurrer to the bill, must govern."

In City of Hutchinson v. Beckham, 118 Fed. 399, 55 C. C. A. 333, Judge Thayer, for the Circuit Court of Appeals for this circuit, said:

"From the complainants' standpoint, therefore—and the case must be judged from their standpoint, and not exclusively from the standpoint of the city—the amount involved in the litigation was not merely the license tax of $500 which accrued on June 1, 1900, but it was the total amount of their loss incident to the causes aforesaid, if the bill was not entertained, and if the city was left free to pursue its own course in enforcing the ordinance. Our attention has been invited to several cases which were brought to enjoin the collection of taxes that were alleged to be illegal, in which it was held that the amount in controversy for jurisdictional purposes was the amount of the tax (Transfer Co. v. Pendergrass, 16 C. C. A. 585, 70 Fed. 1; Walter v. Railroad Co., 147 U. S. 370, 13 Sup. Ct. 348, 37 L. Ed. 206; Railroad Co. v. Walker, 148 U. S. 391, 13 Sup. Ct. 650, 37 L. Ed. 494); but an examination of these cases shows that they are not analogous to the case at bar, in that it did not appear that the complainants would sustain any other direct damage save the amount of the tax, which, if paid under protest, they could recover in an action at law, if the tax was found to be illegal. The present case is distinguishable from the cases relied upon by the appellants, in that the tax involved is a license tax imposed by a municipality upon a business concern, the payment of which tax may be enforced by fining and imprisoning its employés and by daily arrests that will seriously interfere with the prosecution of complainants' business, and inflict a much greater direct loss than the amount of the tax."

In Board of Trade v. Cella Commission Co., 145 Fed. 28, 76 C. C. A. 28, Judge Hook, delivering the opinion for the Circuit Court of Appeals for this circuit, said:

"In a suit to enjoin a threatened or continued commission of certain acts the amount or value involved is the value of the right which the complainant seeks to protect from invasion, or of the object to be gained by the bill. It is not the sum he might recover in an action at law for the damage already sustained, nor is he required to wait until it reaches the jurisdictional amount."

In Humes v. City of Ft. Smith (C. C.) 93 Fed. 857, it is said:

"The defendant insists that the court is without jurisdiction, because the amount in controversy does not exceed the sum of $2,000; that is to say, that the amount which the complainant would have to pay for license to conduct his business does not amount to that sum. Jurisdiction is not determined in that way. Jurisdiction is determined by the value of the right to be protected, or the extent of the injury to be prevented, by the injunction. Railway Co. v. McConnell [C. C.] 82 Fed. 65."

In Scott v. Donald, 165 U. S. 107, 17 Sup. Ct. 262, 41 L. Ed. 648, Mr. Justice Shiras, delivering the opinion of the court, after referring to the averments of the bill, said:

"Such statements sufficiently concede that the pecuniary value of plaintiff's rights in controversy exceed the value of $2,000. Nor can it be reasonably

claimed that the plaintiff must postpone his application to the Circuit Court, as a court of equity, until his property to an amount exceeding in value $2,000 has been actually seized and confiscated, and when the preventive remedy by injunction would be of no avail."

To like effect are the cases of Bitterman v. Louisville & Nashville R. R., 207 U. S. 205, 28 Sup. Ct. 91, 52 L. Ed. 171; Hunt v. N. Y. Cotton Exchange, 205 U. S. 322, 27 Sup. Ct. 529, 51 L. Ed. 821; Howe v. Howe & Owen Ball Bearing Co., 154 Fed. 820, 83 C. C. A. 536; Louisville & N. R. Co. v. Smith, 128 Fed. 1, 63 C. C. A. 1; Northern Pac. Ry. Co. v. Pacific Coast Lumber Mfrs.' Ass'n, 165 Fed. 1, 91 C. C. A. 39; City of Ottumwa v. City Water Supply Co., 119 Fed. 315, 56 C. C. A. 219, 59 L. R. A. 604.

In Barry v. Edmunds, 116 U. S. 550, 6 Sup. Ct. 501, 29 L. Ed. 729, Mr. Justice Matthews, in reviewing an order of the Circuit Court dismissing a bill on the ground here presented, said:

"The order of the Circuit Court dismissing the cause on this ground is reviewable by this court on writ of error by the express words of the act. In making such an order, therefore, the Circuit Court exercises a legal and not a personal discretion, which must be exerted in view of the facts sufficiently proven, and controlled by fixed rules of law. It might happen that the judge, on the trial or hearing of the cause, would receive impressions amounting to a moral certainty that it does not really and substantially involve a dispute or controversy within the jurisdiction of the court. But upon such a personal conviction, however strong, he would not be at liberty to act, unless the facts on which the persuasion is based, when made distinctly to appear on the record, create a legal certainty of the conclusion based on them. Nothing less than this is meant by the statute when it provides that the failure of its jurisdiction, on this account, 'shall appear to the satisfaction of said Circuit Court.' See, also, Henry & Sons & Co. v. Colorado Farm & L. S. Co., 164 Fed. 986 [91 C. C. A. 16]; North American Cold Storage Co. v. City of Chicago et al. [C. C.] 151 Fed. 120."

As the bill in this case specifically avers the amount the Bank will be compelled to deposit with the Treasurer of the State, if it is permitted to comply with the provisions of the act, is more than $2,000, which may be employed by defendants in paying the obligations of other banks to their depositors, and hence not returned to the Bank, and as the act contemplates a continued course of business, I am not of the opinion the bill shows on its face a want of jurisdictional amount in controversy; but, on the contrary, the demurrer for want of jurisdiction as to that case must be overruled, if it be found a case arising under the Constitution and laws of the United States.

It is asserted by complainant in his bill that the act in question is in violation of the national Constitution, because it impairs the obligation of his contract as a shareholder in the Bank by taking its property, of which he in common with the other shareholders are owners, subject only to the payment of the outstanding debts of the corporation, and applies it to the payment of private debts, which neither the Bank nor himself have contracted, and in so doing, without his consent and without an opportunity for him to be heard, is without due process of law. That this claim asserted by him, founded on the protection afforded by the national Constitution, is neither frivolous nor palpably unfounded, is apparent.

In Walsh v. Columbus, etc., Railroad Co., 176 U. S. 469, 20 Sup. Ct. 393, 44 L. Ed. 548, Mr. Justice Brown, delivering the opinion of the court, said:

"We have repeatedly held that; where the plaintiff relies for his recovery upon the impairment of a contract by subsequent legislation, it is for the court to determine whether such contract existed, as well as the question whether the subsequent legislation has impaired it. State Bank of Ohio v. Knoop, 16 How. 369 [14 L. Ed. 977]; Bridge Proprietors v. Hoboken Co., 1 Wall. 116 [17 L. Ed. 571]. This rule also applies to a contract alleged to be raised by a state statute, although the general principle is undoubted that the construction put by state courts upon their own statutes will be followed here. Jefferson Branch Bank v. Skelly, 1 Black, 436 [17 L. Ed.* 173]; McGahey v. Virginia, 135 U. S. 662 [10 Sup. Ct. 972, 34 L. Ed. 304]; Douglas v. Kentucky, 168 U. S. 488 [18 Sup. Ct. 199, 42 L. Ed. 553]; McCullough v. Virginia, 172 U. S. 102 [19 Sup. Ct. 134, 43 L. Ed. 382]. We cannot say that it is so clear that the statute in question is not open to the construction claimed that we ought to dismiss the writ as frivolous, within the meaning of the cases which hold that, where the question is not of the validity but of the existence of an authority, and we are satisfied that there was and could have been no decision by the state court against any authority of the United States, the writ of error will be dismissed."

In Illinois Central Railroad v. Chicago, 176 U. S. 646, 20 Sup. Ct. 509, 44 L. Ed. 622, the same Justice, delivering the opinion, said:

"Without determining the effect of such ordinance, the question whether it impairs the charter of the company, giving to that charter a broad construction, is fairly open to contention. Bacon v. Texas, 163 U. S. 207, 216 [16 Sup. Ct. 1023, 41 L. Ed. 132]; Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 5, 10 [19 Sup. Ct. 77, 43 L. Ed. 341]. The claim is certainly not a frivolous one. In determining the existence of a federal question, it is only necessary to show that it is set up in good faith and is not wholly destitute of merit."

From a consideration of the averments of the bill of complaint in case No. 8,810, I am of the opinion the suit of complainant is one which involves a controversy arising under the provisions of the federal Constitution, and that the amount in controversy is sufficient to confer jurisdiction on this court. Therefore the demurrer, in so far as based on want of jurisdiction, must be overruled.

In regard to the averments of the bill of complaint in case No. 8,816, considered for the purpose of determining its sufficiency to confer jurisdiction on this court to inquire as to the validity of the act in question, it may be observed, in the first instance, that it is wholly immaterial to complainants whether the act be constitutional and valid or unconstitutional and invalid in its scope, operation, or effect in its relation to others. Before complainants may be heard to complain they must show by the averments of their bill such a state of facts existing or threatened as will work a justiciable injury to themselves. Supervisors v. Stanley, 105 U. S. 305, 26 L. Ed. 1044; Clark v. Kansas City, 176 U. S. 114, 20 Sup. Ct. 284, 44 L. Ed. 392; Smiley v. Kansas, 196 U. S. 447, 25 Sup. Ct. 289, 49 L. Ed. 546. As in the present case the parties are each and all citizens of this state, it matters not how much injury may come to complainants by the enforcement of the act, even if it be unconstitutional in matters averred in violation of the provisions of the Constitution of the state, for such matters are exclusively for the consideration and determination of the courts of the

state, unless, in addition thereto, the bill presents a state of facts which, in good faith, raises a controversy as to the validity of the act arising under the Constitution and laws of the United States, the decision of which controversy may be determinative of the case. Metcalf v. Watertown, 128 U. S. 586, 9 Sup. Ct. 173, 32 L. Ed. 543; Tennessee v. Union & Planters' Bank, 152 U. S. 454, 14 Sup. Ct. 654, 38 L. Ed. 511; Blackburn v. Portland Gold Mining Co., 175 U. S. 571, 20 Sup. Ct. 222, 44 L. Ed. 276. Examined in the light of these principles, do the averments of the bill of complaint in case No. 8,816 present a controversy arising under the Constitution and laws of the United States, in which controversy there is involved an amount sufficient to confer jurisdiction on this court?

As seen from the statement made, complainants were corporations of the state, duly organized and doing a banking business within the state, at and prior to the date of the passage and taking effect of the act in question; that a part only of complainants are qualified to accept the conditions imposed and receive the benefits of the act in question; that prior to the passage of this act their shareholders were liable only to creditors of the bank to the amount paid for the shares, and, in addition, the face value of the shares; that if complainants shall accept the provisions of the act they will impose an additional burden on their shareholders to contribute for losses sustained by depositors in other institutions; that as to those of complainants qualified to accept the provisions of the act, which do not accept, and those disqualified, the advantage obtained by those institutions which do accept the provisions of the act will destroy the business of complainants, the value of the right to continue which exceeds in amount that necessary to confer jurisdiction on this court; that complainants in common with other citizens, taxpayers of the state, have been compelled by taxation to contribute to the general revenue fund of the state, which is being employed by defendants to carry the act into operation; that complainants are depositors in and creditors of other state banks which have accepted the conditions and obligations imposed by the act; and that the operation of the act in settling the affairs of such other banks will unjustly discriminate against complainants as creditors of such other banks, and will impair the obligation of complainants' contracts with such banks.

In so far as complainants are qualified to accept the provisions of the act, but decline to do so, I see no just cause on their part to complain of discrimination against them. If they are discriminated against by the terms of the act, the privileges of which they may accept, and they decline to do so, it is their failure to accept, and not the law, which causes the injury, and they will not be heard to complain. As to those complainants disqualified from participating in the benefits of the act, it is not shown that the condition which produces this disqualification may not be changed by such banks and the provisions of the act then accepted. If so, such of complainants may not be heard to contend of the law's discrimination against them, for, in such cases, it is not the law, but the facts constituting the disqualifying conditions, which produce the discrimination. This clearly appears from a considera-

tion of the case of Merchants' Bank v. Pennsylvania, 167 U. S. 461, 17 Sup. Ct. 829, 42 L. Ed. 236, wherein Mr. Justice Brewer, delivering the opinion, said:

"If it be said that a lack of uniformity renders the statute obnoxious to that part of the fourteenth amendment to the federal Constitution which forbids a state to 'deny to any person within its jurisdiction the equal protection of the laws,' it becomes important to see in what consists the lack of uniformity. It is not in the terms or conditions expressed in the statute, but only in the possible results of its operation. Upon all bank shares, whether state or national, rests the ordinary state tax of four mills. To every bank, state and national, and all alike, is given the privilege of discharging all tax obligations by collecting from its stockholders and paying eight mills on the dollar upon the par value of the stock. If a bank has a large surplus, and its stock is in consequence worth five or six times its par value, naturally it elects to collect and pay the eight mills, and thus in fact it pays at a less rate on the actual value of its property than the bank without a surplus, and whose stock is only worth par. So it is possible, under the operation of this law, that one bank may pay at a less rate upon the actual value of its banking property than another; but the banks which do not make this election, whether state or national, pay no more than the regulation tax. The result of the election under the circumstances is simply that those electing pay less. But this lack of uniformity in the result furnishes no ground of complaint under the federal Constitution. * * * Again, it will be perceived that this inequality in the burden results from a privilege offered to all, and in order to induce prompt payment of taxes, and payment without litigation. To justify the propriety of such inducement, we need look no further than the present litigation."

In so far as the bill avers the misapplication of the revenues of the state raised from complainants and others by taxation, while it is true, by reason of the provisions of chapter 334, Laws of 1905, an injunction may be granted to restrain the illegal levy of any tax, charge, or assessment, or any proceeding to enforce the same, and that an injunction may be granted to restrain any public officer, board, or body from entering into any contract or doing any act not authorized by law that may result in the creation of any public burden or the levy of an illegal tax, charge, or assessment, and that any number of persons whose property may be affected by any tax or assessment so levied, or whose burden as taxpayers may be increased by the threatened unauthorized contract or act, may unite in a suit to obtain such relief; and while in a proper case the statutory right of suit here granted might be asserted in this court, yet it is clear, as between citizens of this state, such right cannot be enforced here, even if the value of the rights sought to be protected were sufficient to confer jurisdiction on this court, for such controversy does not arise under the Constitution and laws of the United States.

In so far as it is averred in the bill that by the operation of the act in question the rights of complainants as depositors and creditors of other state banks which have accepted or threatened to accept the provisions of the act, are discriminated against and their contract rights impaired, it will be noticed that it is not averred that any such guaranteed bank in which any complainant has a deposit or credit has failed, or its affairs are about to be settled under the provisions of the act; hence, of necessity, the protection sought against that feature of the act, under the averments of the bill at this time, rests in mere speculation, and is based on no tangible right of complainants. If such event

shall transpire in future, and this feature of the act of which complaint is made shall be attempted to be enforced, to the impairment of the contract rights of any complainant, a controversy of merit may then arise; but such controversy is not presented by the bill in question.

It follows the demurrer based on want of jurisdiction in case No. 8,816 must be sustained; and unless complainants, being so advised by their solicitors, shall amend their bill of complaint by the January, 1910, rules of this court, the bill will stand dismissed for want of jurisdiction.

In so far as the averment of facts contained in the bill of the national banks is concerned, considered now only for the purpose of determining whether a controversy is thereby presented within the jurisdiction of this court, it may be observed that such corporations are created under, are regulated by, and derive their authority solely from national laws; therefore, were it not for Act Cong. March 3, 1887, c. 373, § 4, 24 Stat. 554, as amended by Act Aug. 13, 1888, c. 866, § 4, 25 Stat. 436 (U. S. Comp. St. 1901, p. 514), which provides that for the purpose of jurisdiction national banks shall be deemed citizens of the state in which they are located, as they are created by virtue of national laws, this court would have jurisdiction over any controversy touching their rights under the law of their creation. Osborn v. United States Bank, 9 Wheat. 817, 6 L. Ed. 204; Pacific Railroad Removal Cases, 115 U. S. 1, 5 Sup. Ct. 1113, 29 L. Ed. 319; County of Wilson v. National Bank, 103 U. S. 770, 26 L. Ed. 488; Cummings v. National Bank, 101 U. S. 153, 25 L. Ed. 903; Butler v. National Home for Soldiers, 144 U. S. 64, 12 Sup. Ct. 581, 36 L. Ed. 546; Wash. & Idaho R. v. Cœur D'Alene Ry., 160 U. S. 77, 16 Sup. Ct. 231, 40 L. Ed. 346; Texas & Pacific Railway Co. v. Cox, 145 U. S. 593, 12 Sup. Ct. 905, 36 L. Ed. 829.

While by force of the statute, for the purpose of jurisdiction of this court, complainants in case No. 8,817 must be deemed citizens of this state, and no jurisdiction of this court may attach by reason of complainants being created by national laws, yet, when a right is asserted by a national bank under authority of the law of its creation, the determination of such right involves a federal question, of which this court has jurisdiction, if the amount involved be sufficient to confer jurisdiction on this court, and, jurisdiction once having attached, the court may proceed to a complete determination of the rights of the parties as to all matters in issue.

While by section 13 of the act in question the benefits and privileges of the act are tendered national banks doing business in the state, on condition of their submitting to the visitorial control of state officials, and on condition that such acceptance be authorized by their shareholders and board of directors, in the manner provided in section 1 of the act, and on compliance with the other conditions of the act, yet that complainants by the very law of their creation are precluded from accepting the terms, conditions, and obligations of the act does not admit of doubt or argument, but is conceded. Therefore, as the disqualification of complainant national banks to accept the provisions of the

act arises, not from the consideration of any question of fact, but solely and alone from the provisions of the law of their creation, enacted in pursuance of authority conferred on Congress by the national Constitution, which is the supreme law of the land, it must be conclusively presumed the Legislature of the state, in enacting the act in question, notwithstanding the provisions of section 13, knew complainants could not accept the conditions and obligations of the act, receive the benefits thereof, or be bound thereby.

Bearing in mind these general observations, the jurisdiction of this court over the controversy presented by the facts charged in the bill will be considered.

As has been seen by the statement made, the facts relied upon to confer such jurisdiction are: (1) That complainants are by the act unjustly discriminated against: (a) Because not entitled to share its benefits and protection in common with others; (b) as depositors and creditors of state banks which have accepted the provisions of the act in the liquidation of their affairs. (2) That it was the object, intent, and purpose of the act to destroy the business of complainants as national banks, and that in its actual operation such is its effect, and that the value of the right of each complainant to continue in the business transacted by it is in excess of the amount necessary to confer jurisdiction on this court. (3) That complainants are, in common with others, being assessed under the revenue laws of the state and have paid into the treasury of the state large sums of money raised by taxation, which is being by defendant officials unlawfully expended in putting the act in operation, the benefits of which complainants may not enjoy.

In so far as complaint is made of the act in question, that its operation will discriminate against complainants as depositors in or creditors of those banks of the state which are qualified to and do accept the provisions of the act in the liquidation of the affairs of such banks after insolvency has intervened, as has been said, in case No. 8,816, of the state banks, the bill in this case does not charge any such imminent injury as stands in need of protection at this time. Any such injury to complainant must depend: (1) On the failure of such guaranteed state bank; (2) on whether complainants, or some one of them, shall, at the date of such failure, be a depositor in or creditor of such a bank. Therefore it will be sufficient if the rights of complainants in this respect shall be considered when a case arises in which relief against a threatened injury is actually existent and apparent.

In so far as the bill charges defendants with the misapplication of funds raised by taxation from complainants and others in carrying the act in question into operation and effect, and seeks to restrain such unauthorized act of expenditure by defendant officials, I am persuaded: (1) Chapter 334, Laws of 1905, the provisions of which have been heretofore stated, confers a right of suit which may be enforced by complainants in protecting the interests of their shareholders. Pelton v. National Bank, 101 U. S. 143, 25 L. Ed. 901; Cummings v. National Bank, 101 U. S. 153, 25 L. Ed. 903; Hills v. Exchange Bank,

175 F.—25

105 U. S. 319, 26 L. Ed. 1052. (2) That in a proper case (and by the word "proper" I mean a case over which this court has jurisdiction) such statutory right of suit as is therein granted may be enforced by a Circuit Court of the United States sitting in equity. Van Norden v. Morton, 99 U. S. 378, 25 L. Ed. 453; Norwood v. Baker, 172 U. S. 269, 19 Sup. Ct. 187, 43 L. Ed. 443; Cummings v. National Bank, supra; San Francisco National Bank v. Dodge, 197 U. S. 70, 25 Sup. Ct. 384, 49 L. Ed. 669; Williams v. Crabb, 117 Fed. 193, 54 C. C. A. 213, 59 L. R. A. 425; Platt v. Lecocq, 158 Fed. 723, 85 C. C. A. 621, 15 L. R. A. (N. S.) 558. (3) As the statute permits any number of persons, whose burdens as taxpayers may be increased by the doing of the threatened unauthorized act of an official, to join in the complaint brought to obtain the injunctive relief, it is the value of the right sought to be protected from invasion by the doing of the unlawful act threatened, and not the interest of each separate complainant, as measured by the amount its burden of taxation will be increased, that determines the amount in controversy, considered for the purpose of establishing the jurisdiction of the court in which suit is brought. Davies v. Corbin, 112 U. S. 36, 5 Sup. Ct. 4, 28 L. Ed. 627; Brown v. Trousdale, 138 U. S. 389, 11 Sup. Ct. 308, 34 L. Ed. 987; Ogden City v. Armstrong, 168 U. S. 224, 18 Sup. Ct. 98, 42 L. Ed. 444; City of Ottumwa v. Water Supply Co., 119 Fed. 315, 56 C. C. A. 219, 59 L. R. A. 604; Johnston v. City of Pittsburg (C. C.) 106 Fed. 753; Board of Trustees v. Berryman (C. C.) 156 Fed. 112.

However, if the right of complainants to bring and maintain such suit be based either on the authority of the statute of the state to which reference has been made, or if it be traced to the general principles of right and justice, to which reference is made by the court in Crampton v. Zabriskie, 101 U. S. 601, 25 L. Ed. 1070, it is equally clear, since the passage of the act of June 12, 1882,[1] fixing the citizenship of national banks for the purpose of jurisdiction in the state in which they are chartered to engage in business, such suit may not be instituted by complainants in this court, no matter what may be the amount in controversy; for the determination of the right asserted does not involve the construction of the Constitution or laws of the United States, and hence does not raise a federal question. However, as has been seen, since in a suit involving such controversy over which a federal court has jurisdiction on other grounds, such as the diverse citizenship of the parties, or when the controversy arises between citizens of the same state, and by reason of the state of facts charged in the bill the relief is not demanded alone by virtue of such state statutory right, but facts sufficient in addition thereto are averred to entitle complainants to the relief prayed, based on the construction of the Constitution or laws of the United States, so as to clearly raise a federal question, a Circuit Court of the United States may take jurisdiction, and, having so done, may proceed to a determination of the entire controversy.

There remains for consideration, in determining the jurisdiction of this court over the controversy presented by the bill, only the charge that the act denies to complainants the equal protection of the law, in

[1] 22 Stat. 162, c. 290 (U. S. Comp. St. 1901, p. 3457).

violation of the fourteenth amendment. It is true, as contended by de-murrant, in so far as the intent of the Legislature in the passage oi the act and its natural and necessary operation and effect is concerned, such matters must be gathered by the court from a consideration of the terms of the act itself, and are not controlled by the averments of the pleader drafting the bill. Dillon v. Barnard, 21 Wall. 430, 22 L. Ed. 673; Equitable Life Assurance Soc. v. Brown, 213 U. S. 25, 29 Sup. Ct. 404, 53 L. Ed. 682. However, as the bill in this case distinctly and particularly charges that the act in its actual operation and effect induces depositors of complainants to withdraw their deposits from complainants and deposit in banks which have accepted the provisions of the act, and that the act in its actual operation is destructive of the business of complainants, such statements must be treated as averments of actual existing facts susceptible of proof. Therefore, in the light of the facts averred in the bill of complaint in this case, I am of the opinion that sufficient is averred to require a consideration of the validity of the act under the provisions of the fourteenth amendment to the Constitution, and to require the taking of proofs if denied.

Therefore the demurrer to the complaint in this case, based on lack of jurisdiction in the court, must be overruled.

Coming now to a consideration of the act itself, for the purpose of determining its validity in respect to those matters charged against it in the bills in cases numbered 8,810 and 8,817, it should be observed that, if the act be not found clearly in violation of the provisions of the national Constitution and laws in respect to the matters charged, its validity must be maintained. With the policy of the act, if valid, whether it shall prove in operation beneficial or detrimental, courts have no concern. That is a question to be considered alone by the law-making power of the state, and for which the courts assume no responsibility. If, however, from a consideration of the provisions of the act itself, and the charges made in the complaints in connection with the rights of the parties litigant, as prescribed in and guaranteed by the provisions of the national Constitution, as construed by the highest judicial tribunal in this land, it be found that the lawmaking power of the state has clearly exceeded its constitutional powers, to the damage of complainants, in matters charged in the bills, then no alternative is left but to so declare. For this purpose courts were established, to which litigants having a justiciable controversy therein have an absolute right to resort, which right may not be denied them, and from which resort they may not be turned away, their cause unheard.

Chief Justice Marshall, in the great case of Cohens v. Virginia, 6 Wheat. 264, 5 L. Ed. 257, said:

"It is most true that this court will not take jurisdiction if it should not; but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the Legislature may, avoid a measure, because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is to exercise our best judgment, and conscientiously to perform our duty."

The charges made by complainant in case No. 8,810 against the act, are: (1) That it impairs the obligation of his contract and the contracts of those similarly situated with him, as shareholders, in violation of article 1 of section 10 of the national Constitution; (2) that the act and its acceptance by the Bank, and the deposit of the funds of the Bank, under the requirements of the act, with the Treasurer of the State, to be distributed in accordance with its provisions, deprives complainant, and those similarly situated with him, of their property without due process of law.

In case No. 8,817, the sole question presented is that the act in question discriminates against complainants to their injury, and denies them the equal protection of the law, in violation of the provisions of the fifth and fourteenth amendments to the national Constitution.

Article 2, § 1, of the Constitution of this state provides:

"The legislative power of this state shall be vested in a House of Representatives and Senate."

By this provision of our state constitution all legislative power possessed by the people of the state in their collective capacity, except that which has been in express terms, or by necessary implication, by the Constitution of the United States conferred on the national Congress, resides in the Legislature of this state, except in so far as by the terms of the state Constitution the people have reserved such power to themselves or restrained that body from its exercise.

It will be observed, by section 1 of the act in question, that the Legislature has not attempted the direct exercise of its power on any person, natural or corporate, within its jurisdiction. It has not by the exercise of its legislative power declared a necessity that any depositor in any bank shall be secured from loss, nor that any banking institution shall provide a guaranty fund for its depositors, or any class of such depositors. In other words, the act in question, of its own weight, touches no subject in either person or property. Before it becomes of any force or effect as a rule of action or conduct for the government of banking associations, the existence of three contingencies, depending on facts, must be established: (1) The institution must be an incorporated banking association doing business in the state, possessing the qualifications required by the act; (2) such banking association must through its board of directors, authorized by its shareholders, pass a resolution accepting the provisions of the act; (3) on the filing of such resolution with the Bank Commissioner of the State, he is required to make an examination of the affairs of the institution, and if found by him from such examination to be properly managed in accordance with the banking laws of the state, and it shall deposit with the Treasurer bonds or money in accordance with the provisions of the act, the Bank Commissioner shall issue his certificate of authorization.

What the legal effect of this act may be after its passage and approval before any banking association had accepted its provisions, or as to any banking association before such acceptance, raises a question of some doubt; for it is clear, as the form of government of the states of this nation, and the nation itself, is not purely republican, but

is a representative republican form of government, and as by the terms of our state Constitution all legislative power possessed by the state has been conferred on a House of Representatives and Senate in legislative session assembled, that all the electors of the state at an election called for that purpose voting in favor of the adoption of the provisions of the act in question could not have constituted it a law of the state. Hence, as it is beyond the power of all of the electors of the state by their expressed consent to constitute the provisions of the act in question a law of the state, does it not follow, of necessity, that that which is ineffectual to bind any citizen of the state as law, without the consent of the citizen, cannot become binding in any other than a contractual sense from its acceptance by the person to be bound thereby?

However this may be, one thing is clear: The act being permissive only, and not compulsory, and depending on its acceptance by the person to be bound thereby, and not alone on the lawmaking will, the source of its authority may not be traced to the exercise of the police power of the state. For the police power of the state is a power resorted to of necessity in the protection and promotion of the health, comfort, safety, and welfare of society. Being a law of force and necessity, of restraints and prohibitions, it may not be by the state committed to the judgment of the citizen to determine whether he will or will not be bound by its exercise. Tiedeman, Limitations of Police Powers, § 1; Freund on Police Power, §§ 3, 8, 22; Lochner v. New York, 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937; C. B. & Q. Railway v. Drainage Com'rs, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596; Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385; Reduction Company v. Sanitary Works, 199 U. S. 306, 26 Sup. Ct. 100, 50 L. Ed. 204; Gardner v. Michigan, 199 U. S. 325, 26 Sup. Ct. 106, 50 L. Ed. 212; Ritchie v. People, 155 Ill. 98, 40 N. E. 454, 29 L. R. A. 79, 46 Am. St. Rep. 315; People v. Steele, 231 Ill. 340, 83 N. E. 236, 14 L. R. A. (N. S.) 361, 121 Am. St. Rep. 321.

Counsel for the defense in their brief assert the effect of the act in question to be only "a permit by the state for banking corporations to amend the charters under which they are doing business." If this statement of the extent and effect of the law be accepted, the question presented is: Can the state lawfully authorize a majority of the shareholders of the Bank to so amend its charter as to pledge a portion of its assets to secure the obligations of third persons as against the protest of a dissenting shareholder, and does not such authorization by the state operate to deprive a dissenting shareholder of his property without due process of law? And does not the act of the Bank in making a pledge of its property under such authorization impair the binding force of the contract of the dissenting shareholder with the Bank and the state? Section 1, art. 12, of the Constitution of the state provides:

"The Legislature shall pass no special act conferring corporate powers. Corporations may be created under general laws; but all such laws may be amended or repealed."

The bank in this case was created under the general incorporation act of the state. The manner in which its funds might be invested was prescribed by section 117, Gen. St. 1901, as follows:

, "No bank shall employ its moneys, directly or indirectly, in trade or commerce, by buying and selling goods, chattels, wares and merchandise, and shall not invest any of its funds in the stock of any other bank or corporation, nor make any loans or discounts on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith."

That the charter of a private corporation having a capital stock, such as the bank in question, constitutes a contract between the state and the corporation, between the state and the shareholders in the corporation, and between the corporation and its shareholders, must be conceded to be settled by the authorities. State Bank of Ohio v. Knoop, 16 How. 369, 14 L. Ed. 977; Cooley on Const. Limitations (5th Ed.) § 337; Livingston v. Lynch, 4 Johns. Ch. (N. Y.) 573; Natusch v. Irving, 2 Coppers, Ch. 359. That under the power of amendment and repeal reserved in the Constitution of this state the Legislature may take away and destroy all charter rights and privileges granted for governmental purposes, and not creating a private contract, must be conceded. But, if this is done, the contract rights of the shareholders to the property after the payment of the obligations of the corporation still remain. Mr. Justice Miller, delivering the opinion of the court in Greenwood v. Freight Co., 105 U. S. 13, 26 L. Ed. 961, said:

"Personal and real property acquired by the corporation during its lawful existence, rights of contract or choses in action so acquired, and which do not in their nature depend upon the general powers conferred by the charter, are not destroyed by such repeal; and the courts may, if the Legislature does not provide some special remedy, enforce such rights by the means within their power. The rights of the shareholders of such a corporation to their interest in its property are not annihilated by such a repeal, and there must remain in the courts the power to protect these rights."

In Wilmington Railroad v. Reid, 13 Wall. 264, 20 L. Ed. 568, Mr. Justice Davis, delivering the opinion, said:

"It has been so often decided by this court that a charter of incorporation granted by a state creates a contract between the state and the corporators, which the state cannot violate, that it would be a work of supererogation to repeat the reasons on which the argument is founded."

Again, that under the power reserved in the Constitution the Legislature may lawfully amend the provisions of the general incorporation law under which the Bank was incorporated must be and is conceded. But to this power of amendment there is a limitation set beyond which the state may not go. In Shields v. Ohio, 95 U. S. 319, 24 L. Ed. 357, Mr. Justice Swayne, delivering the opinion of the court, said:

"The power of alteration and amendment is not without limit. The alterations must be reasonable. They must be made in good faith, and be consistent with the scope and object of the act of incorporation. Sheer oppression and wrong cannot be inflicted under the guise of amendment or alteration. Beyond the sphere of the reserve powers, the vested rights of property of corporations, in such cases, are surrounded by the same sanctions and are as inviolable as in other cases."

The property of a shareholder may be used by the corporation in any legitimate manner to further the business for which the corpora-

tion was created, and the state may, under its reserve power of amendment, from time to time change the manner of such use and the means employed to further the purpose for which the corporation was created; but "a material and fundamental change in the charter by an amendment to that charter is an unconstitutional violation of the contract rights of any shareholder who does not consent to such an amendment." Cook on Stock and Stockholders (3d Ed.) § 500; Marietta, etc., R. R. Co. v. Elliott, 10 Ohio St. 57; Fry's Executor v. Lexington, etc., R. R. Co., 2 Metc. (Ky.) 314; Hill v. Glasgow R. Co. et al. (C. C.) 41 Fed. 610; Stephens v Rutland R. R. Co., 29 Vt. 545; Middlesex Turnpike Corporation v. Locke, 8 Mass. 268; Cherokee Iron Co. v. Jones, 52 Ga. 276.

That the act of the Bank in pledging its property, as has been done in this case, to be applied to the discharge of the obligations of third parties, in the absence of the authorization of the act in question, would be an act beyond its authority, ultra vires and void, must be conceded. That the contract of the depositor with a bank is a private contract, and that money taken for the purpose of reimbursing such depositor for loss sustained, or which may be sustained on such contract, is a taking of property for a private and not a public or governmental purpose, is conclusively settled. State v. Township of Osawkee, 14 Kan. 418, 19 Am. Rep. 99; Lowell v. Boston, 111 Mass. 454, 15 Am. Rep. 39. That the state may not through the exercise of the power of taxation, or by the exercise of any other governmental power, take private property for a purely private purpose, is also conclusively established. Loan Ass'n v. Topeka, 20 Wall. 655, 22 L. Ed. 455; Parkersburg v. Brown, 106 U. S. 487, 1 Sup. Ct. 442, 27 L. Ed. 238; Cole v. La Grange, 113 U. S. 1, 5 Sup. Ct. 416, 28 L. Ed. 896; Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169; Mo. Pac. Ry. v. Nebraska, 164 U. S. 403, 17 Sup. Ct. 130, 41 L. Ed. 489; Dodge v. Mission Township, 107 Fed. 827, 46 C. C. A. 661, 54 L. R. A. 242; Crescent Liquor Co. v. Platt (C. C.) 148 Fed. 894; Alma Coal Co. v. Cozad, 79 Ohio St. 348, 87 N. E. 172, 20 L. R. A. (N. S.) 1092; Baltimore & Eastern Ry. Co. v. Spring, 80 Md. 510, 31 Atl. 208, 27 L. R. A. 72; Lucas v. State, 75 Ohio St. 114, 78 N. E. 955; State v. Froehlich, 118 Wis. 129, 94 N. W. 50, 61 L. R. A. 345, 99 Am. St. Rep. 985; William Deering & Co. v. Peterson, 75 Minn. 118, 77 N. W. 568; State v. Switizler, 143 Mo. 287, 45 S. W. 245, 40 L. R. A. 280, 65 Am. St. Rep. 653.

As, therefore, an attempt on the part of the Bank to employ its property for the purpose of securing the contract of deposit made by an individual with another bank, or in reimbursing such depositor for loss sustained on his contract, is clearly beyond its power and void as against complainant, a shareholder in the Bank, and as the use of money for such purpose is a purely private use, for which the state may not take it, it follows, of necessity, that that which it is beyond the power of the state to take directly is beyond its power to authorize a corporation of its creation to take for such purpose, against the protest of complainant, a minority shareholder dissenting therefrom; and it must be held that the act of the state in attempting to

confer such power on the Bank impairs the obligations of the contract of complainant who dissents therefrom, with the Bank, and with the state, in violation of article 1, § 10, of the national Constitution. Such a taking is also without due process of law and in violation of the fourteenth amendment to the federal Constitution.

As to what constitutes due process of law, Mr. Justice Brown, in Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780, said:

> "Recognizing the difficulty in defining, with exactness, the phrase 'due process of law,' it is certain that these words imply conformity with natural and inherent principles of justice, and forbid that one man's property, or right to property, shall be taken for the benefit of another, or for the benefit of the state, without compensation."

It follows, the demurrer, for want of equity, in case No. 8,810, must be overruled.

Is there want of equity in the averments of the bill in case No. 8,817 of the national banks? It is true, as asserted by complainants in this case, that national banks are created by authority of Congress for a public purpose, and are necessary instrumentalities and agencies of the general government. In Osborn v. United States Bank, 9 Wheat. 738, 6 L. Ed. 204, Chief·Justice Marshall, delivering the opinion of the court, said:

> "Let this distinction be considered. Why is it that Congress can incorporate or create a bank? This question was answered in the case of McCulloch v. State of Maryland [4 Wheat. 316, 4 L. Ed. 579]. It is an instrument which is 'necessary and proper' for carrying on the fiscal operations of government. Can this instrument, on any rational calculation, effect its object, unless it be endowed with that faculty of lending and dealing in money, which is conferred by its ·charter? If it can, if it be as competent to the purposes of government without as with this faculty, there will be much difficulty in sustaining that essential part of its charter. If it cannot, then this faculty is necessary to the legitimate operations of government, and was constitutionally and rightfully ingrafted on the institution. It is, in that view of subject, the vital part of the corporation; it is its soul; and the right to preserve it originates in the same principle, with the right to preserve the skeleton or body which it· animates. The distinction between destroying what is denominated the ·corporate franchise and destroying its vivifying principle is precisely as incapable of being maintained as a distinction between the right to sentence a human being to death and the right to sentence him to total deprivation of sustenance during life. Deprive a bank of its trade and business, which is its sustenance, and its immortality, if it have that property, will be a very useless attribute."

In Farmers', etc., Nat. Bank. v. Dearing, 91 U. S. 29, 23 L. Ed. 196, Mr. Justice Swayne, delivering the opinion of the court, said:

> "The national banks organized under the act are instruments designed to be used to aid the government in the administration of an important branch of the public service. They are means appropriate to that end. Of the degree of the necessity which existed for creating them Congress is the sole judge. Being such means, brought into existence for this purpose, and intended to be so employed, the states can exercise no control over them, nor in any wise affect their operation, except in so far as Congress may see proper to permit. Anything beyond this is 'an abuse, because it is usurpation of power which a single state cannot give.' Against the national will 'the states have no power, by taxation or otherwise, to retard, impede, burthen, or in any manner control, the operation of the constitutional laws enacted by Congress to carry into ·execution the powers vested in the general government.' Bank of the United States v. McCulloch, supra [McCulloch v. Maryland, 4 Wheat. 316, 4

L. Ed. 579; Osborn v. Bank of the United States, 9 Wheat. 738, 6 L. Ed. 204]; Weston and Others v. Charleston, 2 Pet. 466 [7 L. Ed. 481]; Brown v. Maryland, 12 Wheat. 419 [6 L. Ed. 678]; Dobbins v. Erie County [16 Pet. 435, · 10 L. Ed. 1022]. The power to create carries with it the power to preserve. The latter is a corollary from the former. The principle announced in the authorities cited is indispensable to the efficiency, the independence, and, indeed, to the beneficial existence, of the general government; otherwise it would be liable, in the discharge of its most important trusts, to be annoyed and thwarted by the will or caprice of every state in the Union. Indefinite confusion would follow. The government would be reduced to a pitiable condition of weakness. The form might remain, but the vital essence would have departed."

In Davis v. Elmira Savings Bank, ·161 U. S. 275, 16 Sup. Ct. 502, 40 L. Ed. 700, Mr. Justice White, delivering the opinion of the court, said:

"National banks are instrumentalities of the federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt by a state to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the federal government to discharge the duties, for the performance of which they were created. These principles are axiomatic, and are sanctioned by the repeated adjudications of this court."

In Easton v. Iowa, 188 U. S. 220, 23 Sup. Ct. 288, 47 L. Ed. 452, Mr. Justice Shiras, delivering the opinion of the court, said:

"That legislation has in view the erection of a system extending throughout the country, and independent, so far as power is conferred or concerned, of state legislation, which, if permitted to be applicable, might impose limitations and restrictions as various and numerous as the states. Having due regard to the national character and purposes of that system, we cannot concur in the suggestions that national banks, in respect to the powers conferred upon them, are to be viewed as solely organized and operated for private gain."

In McClellan v. Chipman, 164 U. S. 347, 17 Sup. Ct. 85, 41 L. Ed. 461, Mr. Justice White, delivering the opinion of the court, said:

"National banks 'are subject to the laws of the state, and are governed in their daily course of business far more by the laws of the state than of the nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional.' National Bank v. Commonwealth, 9 Wall. 362 [19 L. Ed. 701]."

In the light of this relation of complainants, as national banks, to the general government and the state, taking into consideration the fact that national banks by the very law of their creation, which all are conclusively presumed to know, are disqualified and prohibited from accepting the provisions of the act in question, and that the Legislature of the state, notwithstanding the provisions of section 13 of the act, knew at the time of its passage complainants were so prohibited, and further, considering the averments of the bill, not only that the act in its actual operation was intended to deprive complainants of their customers and business, thus injuring the rights of their ·

shareholders and impairing their efficiency to discharge the public duties for which they were created, to such an extent as to destroy their business and compel them to surrender their charters, but that in actual operation, by the employment of such means, instrumentalities, and devices as are authorized by the act to be employed by those state-incorporated banks which have accepted the provisions of the act, such is its actual effect in operation, can there be a doubt of the right of complainants to relief from such unhappy situation, or that an act of the state authorizing corporate citizens of its creation to so embarrass and destroy other citizens created by national authority, which cannot escape by accepting its terms, is such an unjust and unreasonable discrimination as amounts to a denial to complainants of the equal protection of the laws? If it were within the power of complainants, as it is of incorporated state banks, to accept the provisions of the act, and thus escape the embarrassment of their situation, they would not, perhaps, be heard to complain on this ground. Or, if their disqualification arose from a state of facts admitting of reasonable adjustment, they might not, perhaps, be heard to complain of the discrimination of the law against them; for by the terms of the act all are invited, under certain conditions, to assume its burdens and accept its benefits. But, as to complainants, disqualified by the law of their very existence, the benefits and obligations of which they must surrender before they may accept the invitation extended, the very invitation itself becomes a mere brutum fulmen, and is in legal effect as though complainants, by name, had been expressly forbidden and prohibited from accepting and enjoying the privileges extended by the act to those institutions of state origin qualified, or which may become qualified, under its terms.

From a consideration of the provisions of the act in question for the purpose of discovering its true intent, object, and purpose, in view of the fact that national banks are prohibited from accepting its provisions and participating therein, and as such prohibition arises from the law of their creation, which is conclusively presumed to be known of all men, it must be found the true intent, object, and purpose of the act in question was to enable certain banks incorporated under the laws of the state, by accepting its provisions, to create and maintain a fund in possession of the Treasurer of the State, to be employed for the purpose of securing the payment of certain favored contracts of deposit made with any bank contributing to such fund in case of the insolvency of any contributing bank, to the exclusion of all other contract creditors with such insolvent bank, and for the purpose of making public display of the fact that the deposits with any contributing bank are guaranteed under the terms of the act for the purpose of attracting depositors to such bank. If this be its true intent and purpose, must not the natural and inevitable effect of such an act be to attract deposits, and especially those of the guaranteed class, from all other banks not participating, and draw them into the banks co-operating with the state in the enterprise, to the disadvantage and loss of those prohibited from participating? This is the actual effect of the arrangement in operation as averred by complainants in their bill.

The question of grave and controlling importance is: Does such legislation by and co-operation of the sovereign state with banks of its creation violate rights guaranteed to complainants by the national Constitution and laws enacted in pursuance thereof, which are alike the supreme law of the land, and the law of complainants' existence? It is true, as contended by defendants, that this law does not operate directly in any manner on complainants. It in no way controls or regulates the conduct of their business affairs. It prescribes no rules for complainants' guidance and prefixes no penalties for their violation. It directly creates no burden which they must assume and carry. Therefore it is confidently asserted by demurrants that whatever disadvantage in business affairs, inconvenience, or loss may befall complainants from the actual operation of the act is merely incidental to the lawful exercise of legislative power by the state. Therefore they will not be heard to complain.

The government, through the lawful exercise of its constitutional power, has deemed it wise to create its instrumentalities and agents in all parts of this commonwealth, in the necessary and convenient transaction of its public governmental affairs, the continued existence of which, with functions unimpaired, are as essential to the objects of government as was their creation in the first instance. Therefore, wherever the power of the government was exerted for the establishment of such necessary instrumentalities, does not the power of the government extend for their protection against destruction or impairment of their ability to discharge the public functions which were the object of their creation, and this regardless of the fact as to whether the force destructive of their continued existence or vitality arises from a direct exercise of the power of the state against them, or such destructive force be created against them on the part of the state by indirection? Must not the power to create a life, the continued existence of which is necessary for the purpose of the creator, of necessity include the power to preserve that life, with vigor unimpaired, against a destructive force arising from one source as well as another? I think this must be true. In the great case of Marbury v. Madison, 5 U. S. (1 Cranch) 137, 2 L. Ed. 60, Chief Justice Marshall, delivering the opinion of the court, said:

"To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the person on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation."

In Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, Mr. Justice Harlan, delivering the opinion of the court, said:

"The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the Legislature had transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has not real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

In reason, therefore, may not complainants, as national banks, challenge the constitutional validity of this act which confers privileges on incorporated banks of the state which are denied to them, not from choice, but by the law of their existence, with like propriety and effect as though the act cast on complainants burdens from which such state banks are by the terms of the act exempt? And do not the authorities controlling here so declare? The language of the fourteenth amendment is:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Mr. Justice Field, in Hayes v. Missouri, 120 U. S. 68, 7 Sup. Ct. 350, 30 L. Ed. 578, said:

"The fourteenth amendment to the Constitution of the United States does not prohibit legislation which is limited either in the objects to which it is directed, or by the territory within which it is to operate. It merely requires that all persons subjected to such legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed. As we said in Barbier v. Connolly, speaking of the fourteenth amendment: 'Class legislation, discriminating against some and favoring others, is prohibited; but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment.' 113 U. S. 27, 32 [5 Sup. Ct. 357, 360, 28 L. Ed. 923.]"

In Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, Mr. Justice Matthews, delivering the opinion of the court, said:

"The fourteenth amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any difference of race, or color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws."

In Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679, Mr. Justice Harlan, delivering the opinion of the court, said:

"We have also said: The fourteenth amendment, in declaring that no state 'shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended, not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition; and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses."

In Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014, Mr. Justice Brewer, delivering the opinion of the court, said:

"The equal protection of the laws, which, by the fourteenth amendment, no state can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public. This, as has been often observed, is a government of law, and not a government of men, and it must never be forgotten that under such a government, with its constitutional limitations and guaranties, the forms of law and the machinery of government, with all their reach and power, must in their actual workings stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held."

In Cotting v. Kansas City Stockyards Co., etc., 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92, Mr. Justice Brewer, delivering the opinion, of the court, and quoting with approval from the opinion of Judge Catron, in Vanzant v. Waddel, 2 Yerg. (Tenn.) 260, said:

"Every partial or private law, which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were this otherwise, odious individuals and corporate bodies would be governed by one rule, and the mass of the community, who made the law, by another."

In State v. Goodwill, 33 W. Va. 179, 10 S. E. 285, 6 L. R. A. 621, 25 Am. St. Rep. 863, it is said:

"The rights of every individual must stand or fall by the same rule of law that governs every other member of the body politic under similar circumstances; and every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by restricting the privileges of certain classes of citizens, and not of others, when there is no public necessity for such discrimination, is unconstitutional and void."

"The inhibition of the fourteenth amendment, that no state shall deprive any person within its jurisdiction of the equal protection of the laws, was designed to prevent any person or class of persons being singled out as a special subject for discrimination and favoring legislation." State v. Mitchell, 97 Me. 66, 53 Atl. 887, 94 Am. St. Rep. 481.

In McKinster v. Sager, 163 Ind. 671, 72 N. E. 854, 68 L. R. A. 273, 106 Am. St. Rep. 268, that court said:

"But it is not the business of the state to make discriminations in favor of one class against another, or in favor of one employment against another. The state can have no favorites. Its business is to protect the industry of all, and to give all the benefit of equal laws."

In the light of the foregoing authorities, it must be held that a legislative enactment that confers special privileges and benefits on a class which, by the law, and not by conditions, are denied to another class in the same business or calling, and which privileges and benefits so conferred on the favored class may be and are employed to impair and destroy the business of those belonging to the excluded class, is inhibited by the provisions of the fourteenth amendment to the national Constitution. And more especially must this be true, I think, in a case such as this, where the business conducted by the excluded class is not only of the same nature and character as that transacted by the favored class, and is conducted in the same city, town, or locality, and in competition one class with the other, but, further,

where the class excluded from participating in the privileges and benefits of the act was created for a public purpose, and the members are charged with the performance of important governmental functions requisite and necessary to be transacted promptly and efficiently in maintaining the stability, dignity, and perpetuity of the government itself. While it is true, such agencies, created by the general government to assist in the discharge of its public governmental affairs, must, of necessity, come in competition with institutions transacting like business created by the several states, and must, when subjected to the enforcement of like and equal laws, survive or perish as the transaction of their business may prove successful and profitable, or the reverse, yet it cannot be true that the states may, at will, either by virtue of direct legislative enactments impair or destroy the efficiency or existence of such national institutions, or indirectly, by making institutions of their creation favorites of the law, confer such special privileges and benefits on them that the national institution cannot, in competition with them, endure. For, in the end, the great financial business interests of the people of this country, intrusted to the care and keeping of banking institutions, must depend for its security and prompt adjustment more on the known honesty, ability, and conservatism of those in charge of the affairs of such institution than in the control exercised over them by law. Lasting financial security and permanent commercial prosperity has ever come and can only come to a state from confidence by man reposed in the honesty of purpose, the integrity of character, and the fidelity to duty of his fellow man. It can never come from the operation of unequal, unjust, or partial laws.

As said by Mr. Justice White, in closing the opinion of the court in Davis v. Elmira Savings Bank, supra:

"Nothing, of course, in this opinion, is intended to deny the operation of general and undiscriminating state laws on the contracts of national banks, so long as such laws do not conflict with the letter or the general objects and purposes of congressional legislation. Much was said in argument as to the public policy embodied in the law of the state of New York and the wisdom of upholding it. Our function is judicial, and not legislative. Did we, however, consider motives of public policy, we should not be unmindful of the wise safeguard, in favor of all the people of the United States, resulting from the provision which secures to every one dealing with a national bank a ratable distribution of the assets thereof, thereby stimulating confidence and uniformity of treatment."

Or, as said by Mr. Justice Matthews, delivering the opinion of the court in Yick Wo v. Hopkins, supra:

"This conclusion, and the reasoning on which it is based, are deductions from the face of the ordinance, as to its necessary tendency and ultimate actual operation. In the present cases we are not obliged to reason from the probable to the actual, and pass upon the validity of the ordinances complained of, as tried merely by the opportunities, which their terms afford, of unequal and unjust discrimination in their administration. For the cases present the ordinances in actual operation, and the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so inequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured to the petitioners,

as to all other persons, by the broad and benign provisions of the fourteenth amendment to the Constitution of the United States. Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution. This principle of interpretation has been sanctioned by this court in Henderson v. Mayor of New York, 92 U. S. 259 [23 L. Ed. 543], Chy Lung v. Freeman, 92 U. S. 275 [23 L. Ed. 550], In re Virginia, 100 U. S. 339 [25 L. Ed. 676], Neal v. Delaware, 103 U. S. 370 [26 L. Ed. 567], and Soon Hing v. Crowley, 113 U. S. 703 [5 Sup. Ct. 730, 28 L. Ed. 1145]."

It follows, from what has been said, the demurrers in cases Nos. 8,810 and 8,817 must be overruled and denied. And defendants are ruled to answer the bills in said cases, if so advised by their solicitors, by the January, 1910, rules of this court. Failing to so answer, the bills will be taken as confessed.

Applications for temporary injunctions having been presented on due notice, and full argument by solicitors for the respective parties, and submitted for decision, with the demurrers to the bills, the application in case No. 8,816, of the state banks, will be dismissed.

In case of Larabee, No. 8,810, a temporary injunction will issue restraining the officials of the Bank, its officers, agents, servants, and employés, from further expenditure by the Bank in complying with the terms of the act, and from further compliance with the terms of the act; also, restraining defendant Mark Tulley, as Treasurer of the State, from disbursing the moneys of the Bank in his hands to any person or persons except in restoring it to the custody of the Bank; and, further, restraining Joseph N. Dolley, Bank Commissioner of the State of Kansas, from issuing or delivering to the officials of the Bank any certificate of authority empowering the Bank to conduct its affairs under the provisions of the act, or from in any manner attempting to enforce the provisions of the act in question, or any of the same, against the Bank, its officers, agents, servants, employés, or property, until the further order of this court, on the giving of a bond in the sum of $5,000, to be approved by the clerk or judge of this court.

In case No. 8,817, of the national banks, as the rights of complainants may not be protected in any other manner save by a broad decree, a writ of temporary injunction will issue, as prayed in the bill, to remain in force until the further order of this court, on the giving and approval by the judge or clerk of this court of a bond in the penal sum of $50,000, conditioned as by the law provided.

It is so ordered.